IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Case No. 21-cr-35-RC |
| | ) |
| MASON COURSON, | ) |
| | ) |
| Defendant. | ) |

**SENTENCING MEMORANDUM OF MASON COURSON**

During the January 6 riot, Mason Courson struck a Metropolitan Police Department officer with a baton. The officer had been defending the entrance to the Lower West Terrace tunnel at the Capitol Building. Twenty-seven years old, the Floridian has a three-year-old son. This was the worst mistake of Courson's life. He has pleaded guilty to the top count in the Third Superseding Indictment—assaulting, resisting or impeding officers using a deadly or dangerous weapon. 18 U.S.C. §§ 111(a)(1) and (b). He profoundly regrets his conduct and apologizes to the law enforcement officers who struggled in that chaotic scene. In particular, he apologizes to Officer B.M., whom Courson struck. At sentencing, Courson will express remorse for his involvement in the events at the Capitol that day and will vow never again to interfere with officers during a riot.

Courson contends that the aggravated assault guideline does not apply here. But even if it does, the specific offense characteristic based on a victim's bodily injury cannot apply. The officer's medical report explicitly states that he suffered no bodily injury under the definition of U.S.S.G. §2A2.2(b)(3)(A). Moreover, the PSR has mistakenly added six levels under the victim-related adjustment at U.S.S.G. §3A1.2. Accordingly, if the Court does apply the aggravated

1

assault guideline, Courson's Guidelines range would be 27-33 months' incarceration, not 70-87 months' incarceration, as the PSR calculates it.  Courson has already been incarcerated pretrial (and while waiting for sentencing) for nearly two years.  A sentence within the properly calculated Guidelines range would be sufficient but not greater than necessary to comply with the purposes of § 3553(a).  Sentencing Courson in that range would also avoid an unwarranted sentence disparity with co-defendant Logan Barnhart, who was sentenced to 36 months' incarceration for more severe conduct.

**Factual background**

### A.     Courson's background, family, employment history, and character

Born on October 17, 1995, Courson was raised in Hollywood, Florida.  His upbringing was checkered.  Courson's father was physically and mentally abusive toward him.  After his parents divorced, he began living with his mother at age 16.

After graduating high school, Courson in 2014 enrolled at Methodist University in Fayetteville, North Carolina, where he studied business administration.  After suffering an injury while playing football on the university team, he transferred to Broward College in Weston Florida.  Courson ultimately withdrew from college to begin his career in business.  After working odd jobs for most of his adult life, Courson began work in 2017 as a sales associate for a consumer electronics business in Florida.  Beginning in 2020, Courson started a small business called TG2 Distribution LLC that purchased and resold home audio and video equipment.

Letters submitted on his behalf illuminate Courson's personality and character: a doting father to his three-year-old son and a thoughtful friend and family member.  Courson Ltrs., Exh. 1.

**B.     The conviction and presentence investigation report**

As indicated, Courson pleaded guilty to assaulting, resisting or impeding officers using a deadly or dangerous weapon. 18 U.S.C. §§ 111(a)(1) and (b).

As the PSR finds, video evidence depicts Courson participating in the mob violence outside the Lowest West Terrace tunnel on January 6. PSR, ¶¶ 26-32. At one point, Courson struck Metropolitan Police Department officer B.M. with a baton. *Id.*, ¶ 30.

Based on those facts, the PSR calculated a base offense level of 14 by assigning Courson to the aggravated assault guideline at U.S.S.G. §2A2.2(a). PSR, ¶ 48. Courson disputes the application of this guideline. An "aggravated assault" occurs where the defendant commits a "felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony." U.S.S.G. §2A2.2(a) cmt. n. 1. "Bodily injury" means "any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." U.S.S.G. §1B1.1 cmt. n. 1. As indicated above, Courson is deeply remorseful for his misconduct. Still, he maintains that he did not intend to inflict a "significant injury" on Officer B.M. The Court may infer the absence of that specific intent from the objective fact that Officer B.M. did not incur a significant injury, according to his medical report (discussed *infra*). It may also infer the absence of that specific intent from Courson's observable actions: Courson brought the baton down on the officer's body once; the entire episode occurred in approximately one second. In the melee's chaos, Courson could have struck the officer again but did not. None of the other aggravated assault categories applies. U.S.S.G. §2A2.2(a) cmt. n. 1.

Next, the PSR added a three-level enhancement for the specific offense characteristic of bodily injury under U.S.S.G. §2A2.2(b)(3)(A). PSR, ¶ 50.  That cannot be correct.  Again, bodily injury means "any significant injury. . ." U.S.S.G. § 1B1.1 cmt. n. 1.  Officer B.M.'s medical report, compiled five days after the riot, states the following: (1) the officer only agreed to show up to a medical examination in the first place because "They made me come"; (2) he suffered "no significant injury"; and (3) while the officer had "bruising on his upper left arm," this was not a "significant injury" and the officer "otherwise felt fine." B.M. Medical Report, Exh. 2.  The Court should not find that the government has established "any significant injury," by a preponderance of the evidence, when the medical report explicitly states that there was no "significant injury." *Id.*  That is the only relevant piece of evidence in the record on bodily injury.

Next, the PSR added a six-level enhancement under the victim-related adjustment at §3A1.2(b). PSR, ¶ 52.  That is mistaken.  First, this adjustment does not apply because Courson's offense is properly scored under U.S.S.G. §2A2.4 (obstructing or impeding officers), which already "specifically incorporates this factor." §3A1.2 cmt. n. 2.  Second, the evidence does not show by a preponderance of the evidence that Courson's crime was "motivated" by the victim's status as "a government officer." §3A1.2(b).  In the toxic crowd psychology that developed outside the Capitol that day, any person's resistance to the mob may have motivated its criminal actions, not merely the status per se of law enforcement officers as officers.  No statement by Courson in evidence shows his animosity to the police.

Accordingly, if Courson's offense is scored under U.S.S.G. §2A2.4, his total offense level is 11 (13 less two levels for acceptance of responsibility).  §2A2.4(b)(1).  If Courson's offense is scored under U.S.S.G. §2A2.2, his total offense level is 17 (20 less three levels for

4

acceptance of responsibility). Courson falls under Criminal History Category II. Thus, his Guidelines range is either 10-16 months' incarceration or 27-33 months' incarceration. U.S.S.G. Ch. 5.

**Argument**

**I.      Sentencing procedure**

As it knows, the Court has broad discretion to consider nearly every aspect of a particular case, and a particular defendant, in fashioning an appropriate sentence. *United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007). Although the Court must first calculate the appropriate sentencing range under the Guidelines, it is not bound by the Guidelines or Guidelines Policy Statements. It may make its own policy judgments, even if different from those in the Guidelines. *Kimbrough*, 552 U.S. at 101.

The Court must merely impose a sentence consistent with the terms of 18 U.S.C. § 3553(a) and § 3661. As the Court knows, the cardinal requirement of § 3553(a) is that the "court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes of [§ 3553(a)]. . ." § 3553(a).

**II.     The § 3553(a) factors favor a downward variance**

   **A.      The nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1))**

A number of considerations under § 3553(a)(1) merit a downward variance[1] in Courson's case: (1) his Guidelines range is driven by triple counting on the dangerous weapon factor; (2)

---

[1] If Courson is correct that his Guidelines range is 10-16 months' or 27-33 months' incarceration, the Court would not need to downwardly vary to sentence within that range. His references to a "downward variance" have been included in case the Court's Guidelines calculation goes beyond 27-33 months' incarceration.

5

the deleterious effect on his child; (3) his community and family support; and (4) Courson's remorse.

### 1. Courson's Guidelines enhance his sentencing range for a dangerous weapon three distinct times

If the Court finds that the aggravated assault guideline applies and also enhances Courson's range under both U.S.S.G. §2A2.2(b)(2)(B) (use of a dangerous weapon) and §2A2.2(b)(7) (conviction under 18 U.S.C. § 111(b)), it will have punished Courson *three distinct times based on the same sentencing factor and the same use of a dangerous weapon*:

1. **Base offense level:** Courson's crime would be sentenced under §2A2.2 because it was a felony assault "that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon." U.S.S.G. §2A2.2 cmt. n. 1. The base offense level for §2A2.2 is 14, as compared with the base offense level of 10 under §2A2.4.

2. **Specific offense characteristic**: Courson would also have four levels added on account of his use of a dangerous weapon. U.S.S.G. §2A2.2(b)(2)(B).

3. **Specific offense characteristic**: Courson would then have two levels added for conviction under 18 U.S.C. § 111(b). U.S.S.G. §2A2.2(b)(7). But the Section 111(b) offense here rests on Courson's use of a dangerous weapon.

Thus, because Courson's second-long crime involved a baton, he would be penalized three distinct times, adding *ten levels* to his total offense level (4+4+2). Even if this does not formally constitute impermissible double (or triple) counting under the Guidelines, it seems hard to credit the argument that the Sentencing Commission had this redundant result in mind. A defendant may come under the aggravated assault guideline at §2A2.2 in four different ways, only one of which necessarily involves use of a dangerous weapon. In the three other categories, the addition of four levels for use of a dangerous weapon under §2A2.2(b)(2)(B) would not be

6

double counting. Similarly, a defendant may be convicted under § 111(b) without using a dangerous weapon. Thus, the addition of two levels under §2A2.2(b)(7) need not be redundant to the four-level enhancement under §2A2.2(b)(2)(B).

It was sensible, then, for the Commission to include various weapons-related enhancements to accommodate scenarios where the Chapter 2, Part A offense itself does not necessarily entail the use of a weapon. But, here, where the conviction itself turns on use of a dangerous weapon under § 111(b), it makes little sense, and is likely inconsistent with the intent of the Commission, to punish Courson three distinct times for the same use of the same weapon. That is particularly so where the victim did not suffer bodily injury. This is a weighty reason to downwardly vary from a range that incorporates this factor three times.

### 2. The deleterious effect on Courson's young child

While a Guidelines policy statement provides that "family ties and responsibilities are not ordinarily relevant in determining whether a *departure* may be warranted," U.S.S.G. §5H1.6, (emphasis added), it is still proper to downwardly vary on that basis and, in any case, the Court is empowered to disagree with the Guidelines on policy grounds. *E.g.*, *United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (downwardly varying from 46-57 month guideline range to 12 months in prison and 12 months of home confinement based on defendant's role as a caretaker for eight-year-old son and elderly parents). After *Gall*, the sentencing court does not need to find the defendant's family responsibilities "extraordinary" in order to disregard the policy of U.S.S.G. §5H1.6. *E.g.*, *United States v. Warfield*, 283 Fed. App'x 234, 235 (5th Cir. June 20, 2008). As in every discretionary sentencing decision, the standard is reasonableness.

Here, Courson's son is three years old. If Courson is given a lengthy prison sentence, he will be separated from his son for a significant period of his childhood. Such parental absence

poses risks in many dimensions, such as the grief from separation from an attachment figure; the risks from practical loss of the paternal figure; the damage to an otherwise-normal cognitive, social, emotional developmental trajectory; and the potential for effects on parental mental health before, during, or after incarceration.  *See* Lewis M (Ed.) *Child and Adolescent Psychiatry: A Comprehensive Textbook*. 3d Edition.  Lippincott, Williams, and Wilkins, Philadelphia 2002.  Mainstream child psychiatry recognizes that the sudden absence of the parent of the same sex, in particular, poses significant risks to the child.  *Id.*

The Court has sentencing options available that would both deter Courson and avoid doing extreme harm to his three-year-old son.  These considerations powerfully argue for a downward variance.  *Munoz- Nava*, 524 F.3d at 1137.

        **3.**    **Community and family support**

The financial and emotional support on the outside that a defendant can be expected to receive from family and community members is another valid basis for a downward variance.  *E.g.*, *United States v. Sayad*, 589 F.3d 1110, 1114-15 (10th Cir. 2009) (defendant's "supporting and loving family" a reason for downward variance); *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (family support one of several valid grounds for downward variance from 41-51 months to probation); *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008) (family support one of three valid reasons for 91-month downward variance).

As indicated above and in his letters in support, Courson is part of a loving family that is capable of financially and emotionally supporting him.  That is a ground for downwardly varying.

### 4. Courson's remorse

A defendant's true remorse, whether exceptional or not, is a valid basis for a downward variance. Indeed, district courts may vary downward based on remorse even where the acceptance of responsibility adjustment under U.S.S.G. §3E1.1 does not apply because the defendant exercised his right to trial. *E.g.*, *United States v. Howe*, 543 Fed. 3d 128, 138 (3d Cir. 2008).

Courson deeply regrets his decision to strike a law enforcement officer. He regrets participating in the riot near the tunnel. To the extent his actions at the scene contributed to the injury and distress of outnumbered law enforcement officers, he offers them his sincere apology. Courson apologizes in particular to Officer B.M. Courson will personally demonstrate remorse at sentencing in his allocution and will leave little doubt about his feelings.

### B. Avoiding unwarranted sentence disparities (§ 3553(a)(6))

Section 3553(a) requires courts to fashion a sentence in a way that avoids "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6).

Co-defendant Logan Barnhart also participated in the tunnel violence on January 6. He pleaded guilty to the same count of the indictment as Courson. According to the government, Barnhart

> grabbed an officer's neck and torso and dragged him in a prone position from the police line, out of the Archway, and down a set of stairs into the violent mob, where the officer was further attacked with weapons, including a flagpole and a baton, and sustained physical injuries. Minutes later, Barnhart returned to the police line in the Archway where other rioters were assaulting the line of officers by slamming riot shields into them, striking them, and throwing objects at them. Barnhart joined these rioters in charging against the police line. Barnhart then approached the line of officers wielding a flagpole and used it to strike the officers.

*United States v. Logan Barnhart*, 21-cr-35-RC (D.D.C. 2021), ECF No. 284, p. 2.

9

Barnhart's conduct was far more severe than Courson's. He appears to have committed multiple acts of assault, in contrast to Courson's single act of striking Officer B.M. with a baton. In addition, Barnhart's criminal conduct extended over a period of time whereas Courson's act occurred in a single moment—the time it takes for a baton to move about one foot from Courson's crouching position to Officer B.M.'s body. Barnhart was sentenced to 36 months' incarceration. Sentencing Courson to a period of incarceration greater than Barnhart's would create an unwarranted sentence disparity.

Similarly, co-defendant Justin Jersey pleaded guilty to the same count of the indictment as Courson. According to the government, Jersey

> attacked a line of police officers guarding an entrance to the building. Jersey viciously assaulted one of the officers with his hands, grabbing his face and knocking him to the ground, leaving him vulnerable to attack by other rioters who subsequently dragged the officer out of an archway, down a set of steps, and into a crowd of rioters. Jersey then obtained a weapon – a police baton – and used it to strike at other officers in the line. After retreating back into the crowd, Jersey remained in the area and collected the helmet of the officer he had brutally knocked down as a trophy. The officer sustained serious injuries as a result of the attacks on the LWT, including from Jersey's assault.

*United States v. Justin Jersey*, 21-cr-34-RC (D.D.C. 2021), ECF No. 275, p. 2.

As with co-defendant Barnhart, Jersey's conduct was far more severe than Courson's. Among other criminal acts, Jersey grabbed an officer's face and knocked him to the ground. More importantly, the officers in question sustained serious injuries, unlike Officer B.M. in the case of Courson. *Id.*, p. 26. Jersey was sentenced to 51 months' incarceration. Sentencing Courson to a period of incarceration equal to Jersey's would create an unwarranted sentence disparity.

Consider *United States v. Mark Leffingwell*, 21-cr-5-ABJ (D.D.C. 2021). Leffingwell punched two U.S. Capitol Police officers in the head. *Leffingwell*, 21-cr-5-ABJ, ECF No. 31, p.

2. That was after he posted himself at a Capitol entrance and encouraged others to join him in his "efforts to assault the Capitol." *Id.* Leffingwell pled guilty to assaulting law enforcement officers under § 111(a). Judge Jackson imposed a sentence of six months' incarceration. Sentencing Courson above the properly calculated Guidelines range would create an unwarranted sentence disparity with *Leffingwell*.

C. **The seriousness of the offense and deterrence (§ 3553(a)(2))**

The Court must consider "the need for the sentence imposed . . . to reflect the seriousness of the offense" and to "afford adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant." § 3553(a)(2).

As a result of his serious felony conviction, Courson, not yet 30 years old, will struggle to secure gainful employment throughout his life. Moreover, he has incurred considerable public shame and disgrace through the intense media focus on his case. The government has adduced no evidence to suggest that punishment going beyond these penalties, coupled with a properly calculated Guidelines sentence of incarceration, is "not greater than necessary to comply with the purposes of [§ 3553(a)]. . ." § 3553(a).

Courson did not enter the Capitol Building. He had no preconceived plan to riot. Like hundreds of others in the area, he engaged in criminal conduct in an unprecedented scene of chaos. Courson has no history of political extremism. This case has already turned Courson's life upside down. The government's suggestion that these heavy blows are insufficient to deter the situational crime Courson committed is nonsense.

**Conclusion**

For all the foregoing reasons, Courson respectfully requests a sentence no greater than one falling in a properly calculated Guidelines range.

Dated: June 9 2023                          Respectfully submitted,

*/s/ Nicholas D. Smith*
Nicholas D. Smith (D.C. Bar No. 1029802)
1123 Broadway
Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Attorney for Mason Courson*

### Certificate of Service

I hereby certify that on the 9th day of June, 2023, I filed the foregoing submission with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s): Counsel of record.

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

*/s/ Nicholas D. Smith*
Nicholas D. Smith (D.C. Bar No. 1029802)
1123 Broadway
Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Attorney for Mason Courson*